## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **INTERNACIONAL REALTY, INC.;** | § | |
| **USA BRADENTON, LLC; USA** | § | |
| **CAMBRIA, LLC; USA CONYERS,** | § | |
| **LLC; USA MEYER PARK I, LLC; USA** | § | |
| **MEYER PARK II, LLC; USA** | § | |
| **SEASONS, LLC; CHASCO** | § | |
| **APARTMENTS, LLC; USA COURT** | § | |
| **VILLAGE, LLC; USA SAVOY, LLC;** | § | |
| **and USA HOLLISTER PLACE GP,** | § | |
| **LLC,** | § | **Civil Action No.  5:07-cv-981 - XR** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **DONALD L. FERRARI; ST. GEORGE** | § | |
| **FINANCIAL, INC.; and GENOA** | § | |
| **TRADING COMPANY, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

### Background

Plaintiffs are a collection of entities involved in real estate investments in various states, including Texas.  Plaintiff Internacional Realty, Inc. ("IRI"), a Texas corporation, is either the managing or co-managing member of the other Plaintiffs (collectively herein the "LLCs").  The LLCs own apartment complexes in various states, including Texas, and sell tenant-in-common interests to investors wishing to take advantage of capital gains tax deferment from "like kind" exchanges.[1]

---

[1] I.R.C. § 1031 allows for deferment of federal capital gains taxes from the sale of certain types of property, and requires compliance with a multitude of limitations and restrictions.

U.S. Advisor, L.L.C. ("USA"), based in California, was a business partner with IRI in this apartment investment business. The nature of the IRI/USA partnership was that IRI located the specific apartment complexes and real estate investments, and USA procured capital funding for the investment projects.  USA, through its CEO Kevin Fitzgerald ("Fitzgerald"), allegedly utilized Defendant Donald Ferrari ("Ferrari"), citizen of California, and Ferrari's two companies, St. George Financial, Inc. ("St. George") and Genoa Trading Company, Inc. ("Genoa") (collectively "Defendants"), to refer investors or financial advisors with high net worth clients to IRI for consideration of the 1031 investments being offered by IRI and USA.

Pursuant to supposed industry custom,[2] Defendants were paid a commission for the volume of investments referred to USA and IRI.  Plaintiffs allege Defendants paid some of its commissions to Fitzgerald as a kickback.  Plaintiffs further allege Defendants failed to provide, and did not intend to provide, any referrals to the IRI/USA venture, and that this failure constitutes fraud.

**Legal Standard**

**Personal Jurisdiction**

The party invoking the jurisdiction of the federal court bears the burden of establishing minimum contacts justifying the court's jurisdiction over a nonresident defendant.[3]  When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the nonmovant need only make a prima facie showing of jurisdiction, and the court must accept as

---

[2] Plaintiffs argue that they believed they were obligated to make the commission payments.  Docket No. 21 at ¶22.  Defendants argue there was no contractual obligation and that the commissions were purely discretionary.  Docket No. 17 at 9-10.

[3] Guidry v. United States Tobacco Co., 188 F.3d 619, 625 (5th Cir. 1999).

true the nonmovant's uncontroverted allegations and resolve all factual disputes in its favor.[4]  If there are conflicts between the facts alleged by the Plaintiffs and those alleged by the Defendants in their respective affidavits, such conflicts must be resolved in the Plaintiffs' favor for the purposes of determining whether a prima facie case has been established.[5]  In resolving a jurisdictional issue, the court may review pleadings, affidavits, interrogatories, depositions, oral testimony, exhibits, any part of the record, and any combination thereof.[6]  The prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted.[7]

A federal district court in a particular state may exercise personal jurisdiction over a defendant under that state's long-arm statute.[8]  If the state long-arm statute allows the district court to exercise personal jurisdiction, the exercise of personal jurisdiction must also be proper under the Due Process Clause of the Fourteenth Amendment.[9]  Texas courts have construed the Texas long-arm statute to extend to the limits of the Due Process Clause of the Fourteenth Amendment.[10]

Specific jurisdiction is appropriate when a defendant has purposefully directed his activities at the forum state and the "litigation results from alleged injuries that 'arise out of or relate to' those

---

[4] *Id.*

[5] *Id.* at 626.

[6] Command-Aire Corp. v. Ontario Mech. Sales & Serv., Inc.*, 963 F.2d 90, 95 (5th Cir. 1992).

[7] Panda Brandywine Corp. v. Potomac Elec. Power*, 253 F.3d 865, 869 (5th Cir. 2001).

[8] Submersible Sys., Inc. v. Perforadora Central, S.A.*, 249 F.3d 413, 418 (5th Cir. 2001).

[9] *Id.*

[10] Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990).

activities."[11]  Even when specific jurisdiction is lacking, the court may exercise "general personal jurisdiction," which is personal jurisdiction based on a defendant's contacts with the forum that are generally unrelated to the controversy.[12]  To exercise general jurisdiction, the court must determine that "the contacts are sufficiently systematic and continuous as to support a reasonable exercise of jurisdiction."[13]  General jurisdiction is assessed by evaluating the defendant's contacts with the forum, in toto, over a reasonable number of years, up to the date the suit was filed.[14]  The continuous and systematic contacts test for general jurisdiction "is a difficult one to meet, requiring extensive contacts between a defendant and a forum."[15]

Although Plaintiff alleges that the Defendants engaged in a conspiracy, the Court must evaluate each Defendant's contacts separately to determine whether personal jurisdiction exists.[16]

Even when a defendant has minimum contacts with the forum state, an exercise of personal

---

[11] *See* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

[12] *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868.

[13] Stuart v. Spademan, 772 F.2d 1185, 1191 (5th Cir. 1985) (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).

[14] Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 717 (5th Cir. 1999).

[15] *Submersible Sys.,* 249 F.3d at 419; *See also* Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990) ("The minimum contacts inquiry is broader and more demanding when general jurisdiction is alleged, requiring a showing of substantial activities in the forum state.").

[16] Nat'l Industrial Sand Ass'n v. Gibson, 897 S.W.2d 769, 773 (Tex. 1995) (when a foreign defendant is alleged to have engaged in a conspiracy with a resident, the court will not exercise jurisdiction over the foreign defendant based solely upon the effects or consequences of an alleged conspiracy; rather, the inquiry remains on whether the defendant individually, and not as part of the conspiracy, purposefully established minimum contacts that would satisfy due process); see also *Guidry,* 188 F.3d at 625.

jurisdiction must also be reasonable in light of the forum's interest in the litigation in question.[17]  The court must determine whether maintaining the suit offends "traditional notions of fair play and substantial justice."[18]

**Capacity of Corporation to be Sued**

The capacity of a corporation to be sued is determined by the law of the state under which the corporation is organized.[19]  In the instant case, the corporate defendants are both organized under the laws of the state of Nevada.  In Nevada, a corporation that has complied with various filing requirements is a body corporate, "subject to the forfeiture of its charter or dissolution."[20] "Dissolution . . . does not impair any remedy or cause of action . . . against [a corporation] arising before its dissolution and commenced within 2 years after the date of dissolution."[21]  Additionally, it can be inferred that a corporate entity whose charter has been revoked remains liable despite revocation.[22]

---

[17] *Submersible Sys.,* 249 F.3d at 418 (citing Asahi Metal Indus. Co., Ltd. v. Superior Court of Calif., 480 U.S. 102, 113-14, 107 S.Ct. 1026, 1033 (1987)).

[18] *See* Int'l Shoe Co. v. Washington 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945).

[19] F.R.C.P. 17(b)(2).

[20] NEV. REV. STAT. 78.050(1) (2008).  See also, NEV. REV. STAT. 78.175 (2008) (detailing the revocation and forfeiture procedure, stating that revocation of a corporate charter results in forfeiture of the right to conduct business).

[21] *Id.* at 78.585 (2008).

[22] *See,* e.g. NEV. REV. STAT. 78.750(2) (2008) (detailing service of process upon a corporate entity when its charter has been revoked).  *See also*, Redl v. Sec'y of State, 85 P.3d 797, 800 (Nev. 2004) (finding that, for purposes of Nevada law, a corporation was in existence because it had not been dissolved).

## Analysis

### Genoa is Amenable to Suit

In support of their argument that Genoa lacks the capacity to be sued, Defendants aver Genoa became a defunct corporation on August 1, 2004 when its corporate charter was revoked by the Nevada Secretary of State.[23]  Further, Defendants argue that Genoa has no active corporate officers, and that revocation of a corporate charter results in forfeiture of the right to conduct business in the state of Nevada.[24]  Essentially, Defendants argue Genoa's legal existence, and thus its ability to be sued, terminated August 1, 2004.

It is unclear whether Defendants base Genoa's lack of capacity upon the entity's dissolution or revocation.  Notwithstanding this distinction between dissolution and revocation, the end result appears to be the same.

As set forth above, Nevada law determines the disposition of this issue.  Defendants correctly assert that, in the absence of contrary state law, the dissolution of a corporation abates all pending litigation.[25]  However, Nevada has provided for contrary law in that dissolution of a corporation is not a bar to causes of action arising out of actions occurring *before dissolution*, so long as suit is brought within 2 years of the dissolution.[26]

Here, Defendants allege Genoa became a defunct corporation on August 1, 2004.  Plaintiffs

---

[23] Docket No. 3 at ¶14.

[24] *Id.*

[25] *Id.* (citing Okla. Natural Gas Co. v. State of Okla., 273 U.S. 257, 259, 47 S.Ct. 391, 392 (1927).

[26] NEV. REV. STAT. 78.585 (2008) (emphasis added).

filed suit on October 19, 2007, after the 2 year bar set by Nevada law.  However, Plaintiffs allege they were unaware of Defendants' supposedly fraudulent activities until 2007.[27]  Therefore, Plaintiffs' claims would be barred unless the statute of limitations is tolled.

One manner in which the statute of limitation can be tolled is through the discovery rule.  In Nevada, "a claim does not arise until a litigant discovers, or reasonably should have discovered, the facts upon which a claim is based."[28]  The application of the discovery rule would allow a plaintiff to sue a dissolved corporation for its pre-dissolution activities beyond the 2 year period prescribed by Nevada law where the claims did not arise until after dissolution, making NEV. REV. STAT. 78.585 inapplicable.[29]

If it is found that Genoa was not a dissolved entity, but rather an entity whose corporate charter had been revoked, a reading of Nevada corporations law leads to the conclusion that a corporate entity whose charter has been revoked is still amenable to suit.  For example, one section of Nevada corporations law provides for a manner of "[s]ervice of process on a corporation whose charter has been revoked . . . pursuant to [NEV. REV. STAT.] 78.585."[30]  If the Nevada Legislature intended to provide immunity from suit for a corporate entity whose charter had been revoked, this section would be irrelevant.  Additionally, case law suggests that a corporation that has not been

---

[27] Docket No. 21 at ¶38.

[28] Beazer Homes Nev., Inc. v. Eighth Judicial Dist. Court ex rel. County of Clark, 97 P.3d 1132, 1139 (Nev. 2004).

[29] *See Id.* (interpreting language in NEV. REV. STAT. 78.585 to mean that "a claim does not arise until a litigant discovers, or reasonably should have discovered, the facts upon which a claim is based.").

[30] NEV. REV. STAT. 78.750(2) (2008).

-7-

dissolved is still "in existence" for purposes of Nevada corporations law.[31]

Regardless of whether Genoa's corporate status is that of a dissolved entity or one whose corporate charter has been revoked, it is apparent the entity remains amenable to suit. Therefore, Genoa has been sued in its proper capacity.

**This Court has Specific Personal Jurisdiction over All Defendants**

Defendants' Motion to Dismiss asserts this Court must refrain from exercising personal jurisdiction because "Defendants have insufficient contacts with Texas, such that maintenance of this suit will violate the Due Process Clause and offend traditional notions of fair play and substantial justice."[32] Defendants argue exercise of specific jurisdiction is inappropriate in that all of their actions were conducted in California,[33] and they did not directly request any referral fees from Plaintiffs.[34] Additionally, Defendants urge that their separate activities must be evaluated because Plaintiffs allege the existence of a conspiracy involving Defendants and others.[35] Further, Defendants argue there are no continuous and systematic contacts sufficient to establish general personal jurisdiction.[36] Finally, Defendants contend fairness and equity prevent assertion of personal jurisdiction.[37]

---

[31] *Redl*, 85 P.3d at 800 (Nev. 2004) (finding that, for purposes of Nevada law, a corporation was in existence because it had not been dissolved).

[32] Docket No. 3 at ¶1.

[33] *Id.* at ¶6.

[34] *Id.* at ¶8.

[35] *Id.* at ¶9.

[36] *Id.* at ¶10.

[37] *Id.* at ¶13.

Defendants' evidence in support of its assertion that personal jurisdiction is lacking is comprised of the following: (1) Defendants' activities were limited to referring investors to USA, and all of that activity occurred solely in California;[38] (2) Ferrari is a resident of California, and has never been a resident of Texas;[39] (3) Ferrari does not own any property or assets in Texas;[40] (4) Ferrari does not conduct business, nor has he ever entered into contracts in Texas concerning Plaintiffs;[41] (5) St. George and Genoa have never maintained any offices or agents in Texas, and they do not own any property in Texas;[42] (6) St. George and Genoa have never entered into any contract concerning Plaintiffs in Texas, and have never conducted business in Texas;[43] (7) Defendants have undertaken "[n]o activities related to the business referrals or payments allegedly at issue" in Texas;[44] (8) Ferrari introduced financial planners who then informed their clients about the IRI/USA investments;[45] (9) "[a]ny sporadic contacts Don L. Ferrari may have had with Texas are insufficient to justify the exercise of [general] personal jurisdiction.";[46] and (10) there were no contacts with

---

[38] *Id.* at ¶6.

[39] *Id.* at ¶7.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.* at ¶8.

[46] *Id.* at ¶10.

Texas by St. George or Genoa, making general personal jurisdiction impossible.[47]

Defendants' Reply to Plaintiffs' Response to Defendants' Motion to Dismiss reveals more details of the specific evidence Defendants believe prevents exercise of personal jurisdiction.[48] Specifically, Defendants (1) clarify that Ferrari's "role . . . was limited to introducing financial planners, none of whom are Texas residents, to US Advisor/Kevin Fitzgerald in California on the possibility that the advisors might know investors interested in the type of product offered by Fitzgerald through U.S. Advisor . . . .";[49] (2) argue that they never requested payment from IRI or the LLCs in connection with any referrals they made where the referred persons invested in the LLCs, but rather, that such invoices were prepared by Fitzgerald;[50] and (3) that Ferrari took only one trip to Texas "that was wholly unrelated to the allegations in this case."[51]

Plaintiffs, in their response, argue that Defendants accomplished their fraud by "visiting Texas to discuss the [apartment investment] deal[s] with IRI and through fraudulent invoices sent to Texas."[52] Also, Plaintiffs argue Defendants received and cashed several checks from Texas banks, and were aware "that the brunt of the injury from their fraud would be felt by Plaintiffs in Texas."[53]

Specifically, Plaintiffs proffer the following evidence in support of their assertion that

---

[47] *Id.*

[48] Docket No. 17.

[49] *Id.* at 3.

[50] *Id.* at 4-5.

[51] *Id.* at 7-8.

[52] Docket No. 10 at ¶6.

[53] *Id.*

Defendants knew their fraud would injure plaintiffs in Texas: (1) Ferrari attended a meeting in San Antonio, Texas with IRI's CEO, Hugh Caraway ("Caraway") during which "Ferrari explained that he would assist Plaintiffs by using his connections to obtain investors. . . .";[54] and (2) Ferrari met with Caraway and Fitzgerald in Houston, Texas in 2002, touring potential investment properties and discussing details of the referral fee arrangement.[55]

Additionally, Plaintiffs note that Defendants received in excess of $600,000.00 for their alleged referral services.[56]  In fact, evidence suggests some of the checks sent to Genoa were returned to Texas with instruction that they be reissued.[57]  Lastly, Plaintiffs argue that the lack of substantiating documentation for Fitzgerald's source of an estimated $50,000 - $100,000 of annual income from Ferrari buttresses Plaintiffs' argument that Defendants were fraudulently remitting a portion of the referral fees to Fitzgerald.[58]

Construing the factual disputes in Plaintiffs' favor, as must be done at this stage of litigation, it can be found that Defendants (1) traveled to Texas at least twice and met with IRI concerning investment properties and referral fees; (2) knew their referral services were affecting investments in property located in the state of Texas; (3) knew their referral services concerned a Texas corporate entity; (4) received a substantial amount of remuneration from Texas business entities for said referral services; and (5) directed communication to Texas regarding the correction and re-issuance

---

[54] *Id.* at ¶10.

[55] *Id.* at ¶11.

[56] *Id.* at ¶13.

[57] *Id.* at ¶15.

[58] *Id.* at ¶17.

of checks for referral services.

These facts establish sufficient minimum contacts to support this Court's exercise of specific personal jurisdiction over all Defendants.

**Exercise of Personal Jurisdiction is Fair**

Having found sufficient minimum contacts to justify the exercise of personal jurisdiction over all Defendants, the Court must determine if the exertion of personal jurisdiction offends "traditional notions of fair play and substantial justice."[59] Consideration must be given to

> the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. [The court] must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."[60]

Due to the evidence cited above and the standard by which this Court must evaluate that evidence, it does not appear that the exercise of personal jurisdiction will be unfair or inequitable to Defendants.  According to the evidence presented by Plaintiffs, Defendants voluntarily came to Texas twice to discuss and tour IRI's potential investment properties and evaluate the possibility of referring potential investors to IRI; Defendants created the appearance that their referrals had produced a substantial amount of investment in IRI's properties; Plaintiffs, based on the allegedly fraudulent representations of Defendants, paid over $600,000 in commissions to Defendants; Defendants received and cashed checks written on Texas bank accounts, drawn by Texas corporate entities; and Defendants returned some checks to Texas for correction to reflect the proper payee.

---

[59] Electrosource, Inc. v. Horizon Battery Technologies, Ltd., 176 F.3d 867, 874 (5th Cir. 1999) (quoting *Int'l Shoe Co.,* 326 U.S. at 316, 66 S.Ct. at 158 (1945)).

[60] *Asahi*, 480 U.S. at 113-14, 107 S.Ct. at 1026, 1033 (1987) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct.559, 564 (1980)).

Ferrari is a resident of California, and St. George and Genoa are corporate entities existing under the laws of Nevada.  In reality, it is uncontested that the only person whose presence is necessary for Defendants is Ferrari.  Although defending this lawsuit may be a burden for Defendants, the Court has not been presented with any evidence or argument of the extent of any supposed burden Defendants face.  It is clear that the state of Texas has an interest in seeing that corporate entities organized under its laws are protected from the type of activities Plaintiffs allege Defendants have undertaken.  Also, Plaintiffs have a strong interest in recovering funds it alleges Defendants procured by fraud.  This Court's exercise of personal jurisdiction will not "violate all constitutional standards of fair play and substantial justice."[61]

### Conclusion

Due to the evidence presented and the standard by which this Court must evaluate that evidence, the Court **DENIES** Defendants' 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction and Motion to Dismiss Plaintiff's Claims Against Defendant Genoa Based on its Lack of Capacity to be Sued (Docket No. 3).

It is so ORDERED.

SIGNED this 4th day of April, 2008.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[61] Docket No. 3 at ¶13.

-13-